

| | | |
|---|---|---|
| DENISE TRIMBLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 5489 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| ALLIANCE-DEKALB/ | ) | |
| ROCK-TENN CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Denise Trimble brings this suit against Alliance-DeKalb/Rock-Tenn Company

("Company") alleging racial discrimination and retaliation in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (R. 1, Compl.) Presently before the Court is the

Company's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure. (R. 28, Def.'s Mot.) For the reasons stated below, the Company's motion is granted

in part and denied in part.

## RELEVANT FACTS[1]

Before summarizing the facts of this case, the Court notes that the Company has objected

to several of Trimble's responses to the Company's statement of undisputed facts as well as

Trimble's statement of additional facts for failure to comply with Local Rule 56.1, Federal Rule

of Civil Procedure 56(c), and Federal Rule of Evidence 602. (R. 32-1, Def.'s Rule 56.1 Resp.)

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 Statements. (R. 28,
Def.'s Local Rule 56.1 Statement of Material Facts ("Def.'s Facts"); R. 31-1, Pl.'s Local Rule
56.1 Statement of Additional Facts ("Pl.'s Facts"); R. 32-1, Def.'s Local Rule 56.1 Response to
Pl.'s Local Rule 56.1 Statement of Additional Facts ("Def.'s Rule 56.1 Resp."); R. 31-1, Pl.'s
Local Rule 56.1 Response to Def.'s Local Rule 56.1 Statement of Material Facts ("Pl.'s Rule
56.1 Resp.").)

This Court strictly enforces Local Rule 56.1, *see Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000), and accordingly sustains many of the Company's objections. Specifically, several of Trimble's responses to the Company's facts are not denials supported by the record, but rather argumentative denials without citations to specific evidentiary materials, conclusory assertions, conjecture, or additional facts. The consequence of Trimble's failure to satisfy Local Rule 56.1 in her responses is that the factual allegations are deemed admitted.[2] Additionally, several of the "paragraphs" in Trimble's statement of additional facts, which themselves contain multiple paragraphs, clearly fail to comply with the requirement in Local Rule 56.1 of "short numbered paragraphs" and are therefore disregarded by the Court.[3] *See Benuzzi v. Bd. of Educ. of the City of Chi.*, No. 10-3021, 2011 WL 2909904, at *1 (7th Cir. July 21, 2011) ("We have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require compliance with its local rules governing summary judgment.") (citations omitted).

The Court also agrees that several of Trimble's proposed undisputed facts fail to comply with Federal Rule of Civil Procedure 56(c) and Federal Rule of Evidence 602. Under Rule 56(c), an affidavit or declaration used to oppose a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Rule 602 similarly states that a "witness may not testify to a matter unless evidence is introduced sufficient

---

[2] Specifically, the Court finds that the following responses in Trimble's response to the Company's facts fail to satisfy Local Rule 56.1: ¶¶ 4, 15, 24, 25, 26, 27, 28, 30, 32, 33, 34, 35, 36, 37, 41, and 57.
[3] The Court finds that the following "Additional Facts" fail to comply with Local Rule 56.1: ¶¶ 17, 21, and 22.

to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Accordingly, in an affidavit opposing summary judgment, "[c]onclusory allegations, unsupported by specific facts, will not suffice." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citation omitted). Additionally, "although personal knowledge may include reasonable inferences, those inferences must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Id.* (internal quotation marks and citation omitted). In this case, several of Trimble's purported facts merely parrot—word for word—Trimble's affidavit, which in turn contains allegations and speculation unsupported by Trimble's personal knowledge or other evidence. The Court thus disregards those purported facts.[4] With these exclusions made, the Court now turns to the facts giving rise to this suit, viewing the facts in the light most favorable to Trimble, and drawing all reasonable inferences in her favor. *E.g., Benuzzi*, 2011 WL 2929904, at *3.

Trimble, an African-American woman, was hired by the Company in 1998 to work as a quality auditor at a facility located in DeKalb, Illinois. (R. 31-1, Pl.'s Rule 56.1 Resp. ¶¶ 3, 5, 10.) She held this position until she resigned on April 10, 2007. (*Id.* ¶ 4.)

## I. Facts in support of Trimble's discrimination claim

At some point in 2004 or 2005, Trimble was recommended by Joe Kurete, Trimble's then-supervisor, for the Quality Assurance Manager position in the Company's Martinville, Virginia facility. (*Id.* ¶ 49.) Despite this recommendation, Barbara Harrington, the Vice President of Quality, did not offer her the position. (*Id.*) Shortly thereafter, Kurete

---

[4] Specifically, the Court disregards portions of paragraphs 1, 6, 24, 25, 26, and 27 in Trimble's statement of undisputed facts.

recommended that Trimble be given lead person pay, and Harrington once again declined this recommendation. (*Id.* ¶ 50.) During the first year that Kurete worked for the Company, Kurete lowered the scores on Trimble's performance evaluation from 9s and 10s to 7s and 8s at Harrington's behest. (*Id.* ¶ 51.) Additionally, Harrington withheld bonus money from Trimble in October 2004. (*Id.* ¶ 52.)

In 2005, Trimble applied for the position of Quality Manager in two of the Company's facilities. (*Id.* ¶ 11.) Of the seventeen applicants, eight–including Trimble–were selected for interviews. (*Id.* ¶ 12.) Trimble was interviewed by phone by Harrington and Craig Smith, a Quality Manager. (*Id.* ¶¶ 13-14.) All of the applicants were asked the same set of interview questions, regardless of whether they were interviewed in person or over the phone. (*Id.* ¶ 15.) After the interview round, Trimble ranked sixth out of the eight candidates who were interviewed. (*Id.* ¶ 16.) Harrington considered offering the position to the applicant with the highest interview and overall score, but that applicant withdrew his name from the selection process before Harrington could make an offer. (*Id.* ¶ 17.) Harrington decided not to fill the Quality Manager position at that time because she believed the remaining applicants lacked the skills and experience she sought for the position. (*Id.* ¶ 18.) In August 2005, April Alvarado, the Human Resources Coordinator, informed Trimble that she did not pass the interview round for the Quality Manager opening. (*Id.* ¶ 19.)

## II.    Trimble's complaint of discrimination

In the early morning of November 16, 2006, the DeKalb employees were told that there was not sufficient work for all of them and they had the option to leave and take the rest of the day off. (*Id.* ¶ 31.) Murray Bowens, a line leader, indicated that he was going to take the day off,

4

but he continued to linger on the production floor chatting with Trimble while he was still on the clock. (*Id.* ¶ 32.) Fifty minutes after Bowens was supposed to leave, Ron Blomberg, the general manager, observed that Bowens was still talking with his coworkers. (*Id.* ¶ 33.) Blomberg asked Sharon Beatty, a line leader who was working at the time, what Bowens was still doing in the warehouse. (*Id.*) Beatty, who was visibly angry, responded that Bowens was not doing anything, and that she had previously asked Bowens to help her, but he had declined and continued to chat with Trimble and Quiana Campbell rather than clock out and leave the facility. (*Id.* ¶¶ 34-35.) Blomberg approached Bowens and asked him what he was doing, and Bowens replied that he was leaving. (*Id.* ¶ 36.) Blomberg agreed with him and waited for him to end his conversation and exit the building. (*Id.* ¶ 37.)

On that same day, November 16, 2006, Trimble complained to Alvarado that Blomberg was prejudiced against African Americans and told Bowens, an African-American employee, to go home in a harassing manner that he did not use with employees who were not African American. (*Id.* ¶ 38.) Alvarado began an investigation into Trimble's complaint and interviewed all of the line leaders, maintenance technicians, project managers, production clerks, and all of the African-American employees in the warehouse. (*Id.* ¶ 39.) Alvarado asked each employee whether he or she observed any discriminatory or unfair treatment in the plant, but she was not able to corroborate Trimble's allegations. (*Id.* ¶ 40.) Over the course of the interviews, a few of the employees reported to Alvarado that Trimble spent a lot of time talking to Bowens and Campbell whenever she was on the production floor. (*Id.* ¶ 41.) Alvarado says that over the course of the investigation, she also learned that Trimble discussed her racism accusations during work hours and while production was running and that this behavior was creating a tense

environment and lowering the moral of the other employees. (R. 28-3, Def.'s Facts ¶ 42.) Trimble, on the other hand, contends that she never spoke with employees during work hours regarding the allegations she made against the Company. (R. 31-1, Pl.'s Rule 56.1 Resp. ¶ 42; *id.*, Pl.'s Facts ¶ 10.)

On November 28, 2006, Alvarado met with Trimble and informed her that she was not able to corroborate Trimble's complaints of racism. (R. 31-1, Pl.'s Rule 56.1 Resp. ¶ 43.) The discussion that followed is disputed. Alvarado says she told Trimble that discussing her accusations of racism on the production floor while other employees were working created a tense and uncomfortable working environment for the rest of the employees and lowered morale. (R. 28-3, Def.'s Facts ¶ 44.) Alvarado also says she told Trimble that if she had further complaints, she should report them to her or the compliance hotline. (*Id.* ¶ 45.) Trimble disputes that these were Alvarado's statements. Instead, she contends that Alvarado accused her of bringing down morale by the sheer fact that she made complaints. (R. 31-1, Pl.'s Facts ¶ 11.)

Following the investigation and this meeting, Alvarado did not take any disciplinary action against Trimble. (*Id.*, Pl.'s Rule 56.1 Resp. ¶ 47.) Alvarado did not issue Trimble a write-up, nor did she place any documentation regarding the employees' complaints about her conduct uncovered during the investigation in her personnel file. (*Id.* ¶ 48.)

## III.   Trimble's removal from the interview board

In the facility where Trimble worked, applicants for hourly production positions were evaluated through the "Nowlin Selection Process," which included a "Structured Board Interview" component. (*Id.* ¶ 20.) Alvarado asked Nowlin-trained employees, including Trimble, to participate in the structured board interviews. (*Id.* ¶ 21.) Participation on the panel

was voluntary and employee volunteers did not receive any monetary benefit for their time. (*Id.* ¶ 22.) From 2005 to 2007, eighteen employees participated in the interview panels in addition to Trimble. (*Id.* ¶ 23.)

In 2006, the last full year Trimble participated in the interview panels, Alvarado says that Trimble behaved "unprofessionally" when the panel was trying to reach a consensus on scores by becoming argumentative with and snickering at other panel members when she did not agree with their scores. (*Id.* ¶ 24.) When Trimble was asked to provide support for her scores, she was unable to cite to any evidence to support her scores. (*Id.* ¶ 25.) Alvarado says that when Trimble did not agree with Alvarado's scores, she would snicker at Alvarado, eventually concede and then refuse to talk to Alvarado for a few days after the interview. (*Id.* ¶ 26.) As a result of this behavior, Alvarado began to seek other employee volunteers for the structure board reviews. (*Id.* ¶ 27.) Contrary to Alvarado's statement, Trimble disputes that she behaved unprofessionally, and contends that she was taken off the review board in retaliation for her complaints of racial discrimination. (R. 31-1, Pl.'s Facts ¶¶ 6-7.)

## IV. Blomberg's verbal warning to Trimble

In the last year of Trimble's employment, several DeKalb employees observed that Trimble spent what they believed was an excessive amount of time "chatting" with line leaders when she completed her quality checks. (*Id.*, Pl.'s Rule 56.1 Resp. ¶ 28.) Trimble contends that her job required her to talk with line leaders. (*Id.*, Pl.'s Facts ¶ 3.) On November 29, 2006, a group of line leaders met with Blomberg and complained that Trimble spent too much time chatting and joking around with Bowens and Campbell. (*Id.*, Pl.'s Rule 56.1 Resp. ¶ 29.) Blomberg told the line leaders that he would look into their complaints and personally watch for

the behavior that they had complained of. (*Id.* ¶ 30.) Trimble says that she spent as much time monitoring and talking with white line leaders as she did African-American line leaders, but that Blomberg only monitored and counseled her regarding excessive talking with African-American employees. (*Id.*, Pl.'s Facts ¶¶ 2-4.) She says that she was subject to more scrutiny during her final year with the company than she had been previously. (*Id.* ¶ 1.)

On March 23, 2007, Blomberg met with Trimble to discuss her "excessive chatting" on the production lines and asked Matt Rissman, a Project Coordinator for the Company, to sit in on the meeting as a witness. (*Id.*, Pl.'s Rule 56.1 Resp. ¶ 58.) Earlier that day, Blomberg had observed that Trimble chatted with Campbell on her production line for approximately fifty minutes before she completed her first audits at 7:40 a.m. (*Id.* ¶ 57.) At the meeting, Blomberg told Trimble that she needed to stop chatting and joking around on the production lines and to complete her line audits prior to the start of the shift. (*Id.* ¶ 59.) Blomberg also said that other employees had observed her excessive chatting in the workplace and were tired of seeing her behavior go unchecked. (*Id.* ¶ 60.) Blomberg concluded the meeting by informing Trimble that she needed to stop her excessive chatting and joking on the production lines, do her job, and stop distracting other employees. (*Id.* ¶ 61.) Trimble did not receive any discipline other than the verbal warning to stop chatting and joking around on the production lines. (*Id.* ¶ 62.)

## V.     Trimble's performance reviews

Trimble's performance reviews were conducted periodically and were the result of collaboration between Blomberg and Harrington. (R. 32-1, Def.'s Rule 56.1 Resp. ¶ 13.) In December 2006, Blomberg became aware of Trimble's complaint to Alvarado of Blomberg's discriminatory behavior. (*Id.* ¶ 14.) The Company has no policy to prevent a supervisor who has

been accused of discriminating against an employee from completing performance reviews of that employee. (*Id.*) The performance evaluations can affect an employee's salary, potential for promotion, and continued employment. (*Id.*) Trimble's scores on her April 2007 evaluation performance evaluation were lower in nine of eleven categories than on her October 2006 evaluation. (*Id.* ¶¶ 15-16.) In some categories, her score was half of that in her prior evaluation. (*Id.*) The "overall evaluation" in Trimble's 2006 evaluation was that "Denise is a good performer overall. She is dependable and willing to help out as needed to accomplish team goals." (*Id.* ¶ 15.) In her April 2007 evaluation, the comments in the "overall evaluation" section were significantly longer, and contained negative comments. (*Id.* ¶ 16.)

On February 23, 2007, Trimble filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging that she was discriminated against based on her race and retaliated against for complaining about race discrimination. (R. 31-1, Pl.'s Rule 56.1 Resp. ¶ 8.) On April 10, 2007, Trimble notified the Company that she was resigning. (*Id.* ¶ 63.)

## PROCEDURAL HISTORY

On August 30, 2010, Trimble filed her complaint in this action. (R. 1, Compl.) In her complaint, Trimble presents two claims. First, Trimble alleges a claim of racial discrimination in employment (Count I). (*Id.* ¶ 20.) Second, Trimble avers a claim of retaliation (Count II). (*Id.* ¶ [sic] 20.)

The Company filed a motion for summary judgment on May 17, 2011. (R. 28, Def.'s Mot.) In its motion, the Company argues that Trimble's race discrimination claim is time-barred because all of the incidents she relies upon in support of the claim occurred more than 300 days

9

before Trimble filed her charge of discrimination with the EEOC. (*Id.* at 1.) The Company also contends that it is entitled to summary judgment on Trimble's retaliation claim because she cannot prove all of the elements of a Title VII retaliation claim. (*Id.* at 2.)

In response to the Company's motion, Trimble concedes that her race discrimination claim is time-barred. (R. 31, Pl.'s Resp. at 7.) The Court accordingly grants the Company's motion for summary judgment as it pertains to Trimble's race discrimination claim. Trimble contends, however, that the Company is not entitled to summary judgment on her retaliation claim because there are genuine issues of material fact in dispute. (*Id.*)

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In resolving a motion for summary judgment, the Court draws all reasonable inferences and resolves all factual disputes in the non-moving party's favor. *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009).

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Once a moving party has met this burden, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler*, 539 F.3d at 634. The non-moving party must show that "a

reasonable jury could return a verdict in her favor; if she is unable to 'establish the existence of an element essential to her case, and on which she will bear the burden of proof at trial,' summary judgment must be granted." *Benuzzi*, 2011 WL 2909904, at *9 (citation omitted).

## ANALYSIS

The remaining count of Trimble's complaint alleges that the Company retaliated against her in violation of Title VII because she protested the unequal treatment of African Americans in the workplace and filed a claim with the EEOC. (R. 1, Compl. ¶ 20.) Title VII forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The purpose of this antiretaliation provision is to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). Because of this purpose and the textual distinction between the antiretaliation provision and the antidiscrimination provision, the Supreme Court has held that "Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct . . . and [it] is not limited to discriminatory actions that affect the terms and conditions of employment." *Thompson v. N. Am. Stainless, LP*, 131 S.Ct. 863, 868 (2011) (internal quotation marks and citations omitted). Under this broad construction of the antiretaliation provision, the pertinent inquiry is whether an employer has acted in a way that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citation omitted).

11

As with discrimination claims, a plaintiff may establish a *prima facie* case of retaliation by way of either a direct or indirect method. *Lewis v. City of Chi.*, 496 F.3d 645, 655 (7th Cir. 2007). Here, Trimble seeks to prove that the Company violated Title VII by way of the direct method. (R. 31, Pl.'s Resp. at 8.) This means that she must show three things to survive summary judgment: (1) that she engaged in an activity protected by Title VII; (2) that she suffered a materially adverse action by her employer; and (3) a causal connection between the two. *Benuzzi*, 2011 WL 2909904, at *12. As to the first element, the Company concedes for purposes of this motion that Trimble engaged in statutorily protected activity. (R. 28-2, Def.'s Mem. at 5.) The Company argues, however, that Trimble's retaliation claim fails as a matter of law because she has failed to provide evidence of a materially adverse action. (*Id.* at 1.) Additionally, the Company asserts that even assuming the allegedly retaliatory acts satisfy the materially adverse standard, Trimble has not demonstrated a causal link between those actions and Trimble's complaint of discrimination. (*Id.* at 2.)

I.  **Materially adverse employment action**

Because the "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm," to establish the second element of a retaliation claim, a plaintiff must put forth evidence that she suffered a materially adverse action by her employer. *Burlington*, 519 U.S. at 67-68. A materially adverse action is "one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011) (quoting *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007)). The adverse action must be "material" because "it is important to separate significant from trivial

12

harms." *Burlington*, 519 U.S. at 68 ("Title VII . . . does not set forth 'a general civility code for the American workplace.'"). Whether an act is material will "often depend upon the particular circumstances. Context matters." *Id.* at 69. Accordingly, "[i]n determining the significance of any given act of retaliation, the test is objective but . . . we look at the 'constellation of surrounding circumstances, expectations, and relationships.'" *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 678 (7th Cir. 2010) (quoting *Burlington*, 519 U.S. at 69).

Because this context-specific approach takes into account "the unique circumstances of individual cases," the Seventh Circuit has recognized that it is "impossible" to "create[] a precise list of activities that constitute adverse employment actions." *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008) (citation omitted). The Supreme Court also recently noted that "[g]iven the broad statutory text and the variety of workplace contexts in which retaliation may occur, Title VII's antiretaliation provision is simply not reducible to a comprehensive set of clear rules." *Thompson*, 131 S.Ct. at 868. Nevertheless, under this "flexible, *practical* approach," some actions will usually fall on the "materially adverse" side of the spectrum: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, and significantly diminished material responsibilities." *Atanus*, 520 F.3d at 677-78 (internal quotation marks and citation omitted). On the other hand, while an adverse action "need not be quantifiable in terms of pay or benefits," certain actions are clearly not "materially adverse," including "petty slights or minor annoyances," *Burlington*, 548 U.S. at 68, or acts that are no more "than a mere inconvenience or an alteration of job responsibilities." *Atanus*, 520 F.3d at 677-78 (internal quotation marks and citations omitted). An act that may not ordinarily constitute a materially adverse action, however, may meet the standard if it affects job

opportunities, such as an opportunity for advancement, increased pay, overtime, or perks. *See O'Neal v. City of Chi.*, 588 F.3d 406, 409 (7th Cir. 2009).

Here, Trimble suggests that she was subjected to several materially adverse actions by the company: (1) her removal from the interview panel she had participated in for two years; (2) "excessive monitoring" by Blomberg and others; (3) receiving a "severely negative" review; and (4) being "called to task for alleged behavior problems that were 'discovered' specifically as a result of" Trimble's complaint to human resources. (R. 31, Pl.'s Resp. at 10.) Additionally, she contends she suffered a constructive discharge. (*Id.* at 11.) The Company argues that none of these actions–individually or aggregated–constitute a materially adverse action. (R. 28-2, Def.'s Mem. at 1.)

First, regarding Trimble's removal from the interview panel, the Court agrees with the Company that this was not a materially adverse action. It is undisputed that participation on the panel was voluntary, and there was no financial renumeration to the participants. Additionally, Trimble provides no evidence that participation led to promotions or any other benefits. Indeed, the only "evidence" of the material nature of this action put forth by Trimble is that she believed it was "a sign to her that she would no longer be considered for promotion of any kind." (R. 31-1, Pl.'s Rule 56.1 Resp.) As discussed above, however, this speculation on the part of Trimble is not based on personal knowledge or other evidence, and accordingly is insufficient to defeat summary judgment.[5] If Trimble had put forth evidence that participation on the interview panel affected advancement within the Company, or was otherwise a coveted position, then the context, and therefore the result, could be different. Absent this evidence, however, the Court

---

[5] Additionally, this purported fact was improperly included in Trimble's Rule 56.1 Response, as opposed to being set forth in her additional statement of facts as required by Rule 56.1.

concludes that Trimble's removal from the interviewing committee appears at most to be a "petty slight," not a materially adverse action. *See Atanus*, 520 F.3d at 678 ("[The plaintiff] has not explained whether the change in her title entailed any change in the work that she was performing, whether there was a change in the geographic location or whether the position restricted her opportunities to advance within the [organization]. Without more factual development, [the plaintiff's] claim that she suffered an adverse employment action is deficient."). Given the absence of facts pertaining to the materiality of Trimble's removal from the interview committee, the Court cannot conclude that a reasonable jury could find that this act would dissuade a reasonable employee from filing a complaint of discrimination.

The next purported adverse action posited by Trimble is "excessive monitoring" by her supervisors following her complaint of discrimination. Once again, given the absence of evidence put forth by Trimble related to this claim, the Court concludes that this was not a materially adverse action. As an initial matter, the only evidence of the monitoring and its frequency comes from her own affidavit, in which she states that in her final year she "was subjected to more scrutiny than usual" and was "frequently . . . monitored and even counseled by Rob Blomberg regarding excessive talking with African-American line leaders or employees." (R. 31-1, Pl.'s Facts, Ex. 2 ¶¶ 1-2.) Even generously assuming that Trimble was subject to increased monitoring, which is a reach given that she has no support for that purported fact other than her own subjective belief, she has offered no evidence in support of the materiality of this adverse act. First, Trimble has not put forth any evidence to demonstrate what the "excessive" or "increased" monitoring entailed, other than the use of those adjectives in her affidavit and brief. There is no evidence of how often the monitoring occurred, how Trimble knew she was being

monitored, or how the "increase" in monitoring compared to the monitoring she was subject to before making the complaint of discrimination. Second, Trimble's retaliation claim predicated on the monitoring cannot survive summary judgment because she has presented no evidence pertaining to how being subjected to "more scrutiny than usual" harmed her–or would harm a reasonable employee in her situation–in any way.[6] *See Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (stating that evidence of a change in the plaintiff's hours was insufficient to survive summary judgment absent "evidence of harm").

In sum, there is no evidence on which a reasonable jury could rely tending to prove Trimble's claim that the monitoring was a materially adverse act. The Court can imagine situations in which increased monitoring by a supervisor could rise to the level of a significant harm. As the Supreme Court noted, "[c]ontext matters. The real social impact of workplace behavior depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts." *Burlington*, 548 U.S. at 69 (noting that a "schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children) (internal quotation marks and citation omitted). Here, however, absent any facts indicating the monitoring was anything more than trivial in nature and in its impact on Trimble, the Court concludes that Trimble has failed to put forth facts demonstrating the increased monitoring by her supervisor was a materially adverse action.

---

[6] Trimble does assert in her statement of additional facts that "[t]he environment of hostility—of us vs. them—that developed in the workplace" after she complained of discrimination "got so bad that she had to see a doctor for headaches. The doctor recommended that she take time off of work due to the work related stress." (R. 31-1, Pl.'s Facts ¶ 26.) The doctor's report she cites does not support this statement, however, and says only that Trimble "thinks that [shoulder pains and headaches] started after the stress at work." (*Id.*, Ex. 8.)

Trimble next contends that the negative evaluation she received in April 2007 was a materially adverse employment action. Trimble's performance evaluation for the October 2006 to April 2007 period shows a significant decline in her scores in nearly every area from her evaluation for the April 2006 to October 2006 period. (R. 31-1, Pl.'s Facts, Exs. 4-5.) Additionally, while the prior evaluation had only positive statements about Trimble and her work, the evaluation completed after her complaint contained numerous negative comments. (*Id.*) Importantly, it is undisputed that the performance evaluations at the Company can affect "salary, potential for promotion, and continued employment." (R. 32-1, Def.'s Rule 56.1 Resp. ¶ 14.) In this context, the Court concludes that the threat of a negative evaluation–and the ramifications that come with it–could dissuade a reasonable employee from making complaints or supporting a charge of discrimination thus a reasonable jury could find that it was a materially adverse act.

Seeking to avoid this result, the Company argues that the performance evaluation "does not contain any threats of disciplinary action or termination" and that Trimble "was not subject to any cut in pay, demotion or loss of job duties as a result" of the evaluation. (R. 32, Def.'s Resp. at 3.) Accordingly, the Company contends, the April 2007 evaluation "does not constitute a materially adverse action under the law." (*Id.*)

This argument fails to unsettle the Court's conclusion because it imports the requirements for an "adverse employment action" in the context of discrimination claims under 42 U.S.C. § 2000e-2, into retaliation claims under 42 U.S.C. § 2000e-3. The Supreme Court has made it clear that "Title VII's substantive provision and its antiretaliation provision are not coterminous." *Burlington*, 548 U.S. at 67. While the substantive antidiscrimination provision requires that the

17

action "affect employment or alter the conditions of the workplace" to be materially adverse, the antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 63-64. Instead, as discussed above, an act is materially adverse for purposes of the antiretaliation provision if it is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citation omitted). Thus, in the context of a retaliation claim, a negative performance evaluation in certain contexts can constitute a materially adverse action even if does not actually result in a tangible change in an employee's terms and conditions of employment. *See Silverman*, 637 F.3d at 741 (stating that "we agree with [the plaintiff] that a negative performance evaluation could constitute an adverse action within the meaning of the direct method of proving retaliation," but ultimately granting summary judgment to the defendant because the plaintiff did not show a causal connection). Here, given that a negative evaluation at the Company can have an impact on pay, promotion, and continued employment, a reasonable employee might be dissuaded from filing a complaint of discrimination if that act would cause her to receive a negative evaluation. Accordingly, the Court finds that Trimble has set forth sufficient facts for a reasonable jury to find that the April 2007 performance evaluation was a materially adverse action.

Trimble argues that the fourth materially adverse action she suffered was being "upbraided in front of a witness for engaging in activities that other employees engaged in with impunity." (R. 31, Pl.'s Resp. at 10.) As an initial matter, the Court notes that Trimble has failed to put forth any evidence of another employee who was treated differently than she was. Accordingly, she is left with her contention that being "upbraided in front of a witness" was a materially adverse action, which fails for several reasons. First, Trimble has failed to point to

any evidence of being "upbraided" other than her conclusory assertions. In her statement of facts, she states that she was called into Blomberg's office so that he "could upbraid her for concocted allegations of wrongdoing." (R. 31-1, Pl.'s Facts ¶ 25.) The only facts before the Court, however, are those put forth by the Company pertaining to Blomberg and Trimble's meeting March 23, 2007. At the meeting, Trimble received a verbal warning to stop chatting on the production lines. (*Id.*, Pl.'s Rule 56.1 Resp.) Trimble may not have liked receiving the warning, but she has put forth no evidence indicating that this warning was severe or otherwise threatening. Additionally, there is no evidence of possible negative consequences of the warning for Trimble. Accordingly, Trimble has failed to provide evidence sufficient to defeat summary judgment regarding whether the verbal warning she received from Blomberg constituted a materially adverse act.

Finally, Trimble argues that she was constructively discharged from her employment. (*Id.*, Pl.'s Resp. at 11-12.) This contention clearly fails. A constructive discharge constitutes an adverse employment action and "occurs when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin*, 621 F.3d at 681 (citation omitted). While Trimble's version of events indicate that she was subjected to increased monitoring, received a negative review, was removed from the interview committee, and received a verbal warning—all without cause—this evidence, even assuming all inferences in Trimble's favor, does not demonstrate that her working conditions had become "intolerable." *See id.* Trimble contends that these events show that "she could count out any further promotions." (R. 31, Pl.'s Resp. at 12.) The Seventh Circuit has made it clear, though, that even "a prospect of discharge lurk[ing] in the background" does not

make a working condition intolerable or unbearable. *See Chapin*, 621 F.3d at 681 (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)). Accordingly, given the absence of evidence that Trimble's working conditions had become unbearable when she resigned, the Court concludes that no reasonable jury could find that Trimble was constructively discharged. Thus, because Trimble has failed to put forth evidence demonstrating that her removal from the interview committee, the "increased" monitoring, and the verbal warning were materially adverse actions, the only remaining basis for Trimble's retaliation claim is the negative evaluation she received in April 2007.

## II.    Causal connection

After establishing that she suffered an adverse action by her employer, Trimble next must provide evidence of a causal connection between the adverse action—the April 2007 evaluation—and her complaints of discrimination. *See Lewis*, 496 F.3d at 655. To establish a causal link, Trimble must show that her complaint was "a substantial or motivating factor" in causing her to receive the negative evaluation. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011). In other words, to survive summary judgment, Trimble needs to provide enough evidence to allow a jury to conclude that she received the negative evaluation because of her statutorily protected complaint. *See Burnell*, 2011 WL 3132470, at *4.

Trimble contends circumstantial evidence shows that her complaint led to the negative evaluation. Specifically, she suggests that Blomberg's involvement in the evaluation, the severity of the evaluation, and the timing of the evaluation all demonstrate a causal connection. Viewing all of this evidence together and drawing all inferences in favor of Trimble, the Court

20

agrees that a reasonable juror could conclude that Trimble's negative evaluation was caused by her complaint of discrimination.

First, the Court agrees that Blomberg's involvement in Trimble's evaluation raises red flags. It is undisputed that Trimble complained to Alvarado in November 2006 that Blomberg treated African-American employees in a discriminatory manner. It is also undisputed that Blomberg became aware of this complaint at some point in December 2006, and then provided input into Trimble's April 2007 evaluation. Finally, it is also undisputed that there were no policies or other institutional checks to prevent any possible biases or retaliatory motives that Blomberg may have developed as a result of Trimble's complaint against him from affecting her evaluation. While Blomberg testified at his deposition that he "believed that [his] input was unbiased," a reasonable juror could conclude otherwise given the circumstances.

Second, regarding the evaluation, the significant decline in Trimble's scores between the October 2006 and April 2007 evaluations and the negative comments in the April 2007 support the reasonableness of the inference that Trimble's complaint caused the negative evaluation. In her April 2007 evaluation, Trimble scores were lowered from the October 2006 evaluation in nine of eleven areas measured: from 6 to 5 in safety; from 7 to 6 in knowledge of field; from 7 to 5 in accountability/dependability; from 6 to 4 in initiative; from 8 to 4 in teamwork; from 6 to 4 in interpersonal/communication skills; from 8 to 4 in productivity; from 8 to 6 in attendance/punctuality; and from 7 to 4 in leadership. (R. 31-8, Pl.'s Resp., Exs. 4-5.) No reasons were provided for the drop in three of those areas. (*Id.*) Additionally, Trimble's October 2006 evaluation contains only positive comments, while there are numerous negative comments in the April 2007 evaluation. The October 2006 evaluation, in fact, provides a fairly glowing

review of Trimble; there are no glimpses of the negative evaluation to come just six months later. For example, regarding Trimble's "teamwork" score, the 2006 evaluation states that "Denise is very cooperative and works with others to support team efforts. She is willing to lead or follow on team projects." (*Id.*, Ex. 5 at 4.) The 2007 evaluation, however, concludes that:

> Denise's demonstration of teamwork is inconsistent and unpredictable. Although she will assist in training and do what [is] ask[ed] of her in most situations, there have been situations in which she has exhibited confrontational behavior that creates conflict with others or within the facility. This behavior is detrimental to the smooth and efficient operation of the DeKalb team and does not demonstrate an effort to build constructive relationships.

(*Id.*, Ex. 4 at 4.) The comments in the two evaluations also appear inconsistent in their expectations of Trimble. In the 2006 evaluation, Trimble is said to be "an important contributor to the success of the department. She consistently meets requirements." (*Id.*, Ex. 5 at 5.) In the 2007 evaluation, however, the evaluation states that "[w]hile Denise does perform the minimum number of required audits (2) per line, we have asked that she strive for more than just meeting the minimum requirements." (*Id.*, Ex. 4 at 4.) Given the significant discrepancy between the two evaluations, the Court finds that a reasonable juror could conclude that Trimble's complaint was the causal factor.

Finally, Trimble relies on the timing of the negative evaluation as evidence of the causal link. "The mere fact that one event preceded another does nothing to prove that the first event caused the second; the plaintiff must put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination." *Lewis*, 496 F.3d at 655 (citation omitted). Accordingly, close temporal proximity ordinarily does not provide sufficient evidence of causation to permit a plaintiff to survive summary judgment absent other

evidence that supports the inference of a causal link. *Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("Suspicious timing may be just that—suspicious—and suspicion is not enough to get past a motion for summary judgment."). "Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Loudermilk*, 636 F.3d at 315. When this inference is appropriate "cannot be resolved by a legal rule; the answer depends on context." *Id.* Importantly, the Seventh Circuit has cautioned that "[a] jury, not a judge, should decide whether the inference is appropriate." *Id.*

Here, Trimble made her complaint of discrimination in November 2006, and the negative performance evaluation was completed in April 2007. At first glance, with nearly five months separating the complaint from the adverse act, the timing does not seem to support a causal connection. The Court notes, however, that the Company appears to conduct reviews only every October and April. Thus, the April 2007 evaluation was the first performance evaluation of Trimble completed after she made the complaint. In this context, a reasonable juror could determine that the inference of causation is reasonable because the April 2007 review was the first opportunity for Blomberg to review the employee who had lodged a discrimination complaint against him. The Court notes that the timing of the adverse act alone would be insufficient to prove causation, but given the other evidence discussed above, Trimble has put forth sufficient evidence of a causal link between her statutorily protected complaint and the materially adverse action taken by the Company.

The Company argues that Trimble has failed to present evidence of a causal connection because the Company had a "good faith basis" for the negative evaluation. (R. 32, Def.'s Reply

at 8.) The Company contends that the criticisms of Trimble's performance and her excessive chatting on the production line were rooted in the observations of Harrington, Blomberg, and Trimble's coworkers. (*Id.*) Thus, the Company argues, it has satisfied its burden of articulating non-retaliatory and non-discriminatory reasons for its actions, and Trimble has failed to raise any genuine issue of pretext. (*Id.* at 11.) This argument confuses the burden-shifting formula employed under the indirect method of proving retaliation with the requirements under the direct method. *See Stone v. City of Indianapolis Pub. Util.*, 281 F.3d 640, 643 (7th Cir. 2002). Under the direct method, "[e]vidence, though not conclusive, that the cause was retaliation should be enough to entitle the plaintiff to a jury trial unless the defendant can produce uncontradicted evidence that he would have [taken the adverse action against the] plaintiff anyway." *Id.* Here, the Company puts forth a lawful reason for the negative evaluation—one that the jury might well believe—but that "just creates an issue of fact: what was the true cause of the [negative evaluation]?" *Id.* Trimble contends the cause of the negative evaluation was her complaint of discrimination; the Company maintains the evaluation resulted from performance deficiencies observed by Trimble's manager and co-workers. Given this factual dispute, summary judgment on Trimble's claim for retaliation is denied as it pertains to the negative evaluation Trimble received in April 2007.

## CONCLUSION

For the reasons stated above, the Company's motion for summary judgment (R. 28) is granted in part and denied in part. It is GRANTED with respect to: (1) the entirety of Trimble's discrimination claim in Count I; and (2) Trimble's retaliation claim to the extent it is predicated on her removal from the interview board, the monitoring by her supervisor, the verbal warning

she received, and her claim of constructive discharge. It is DENIED with respect to Trimble's retaliation claim to the extent it is predicated on the April 2007 performance review. The parties are directed to reevaluate their settlement positions in light of this opinion and to exhaust all efforts to settle this case. A status hearing will be held on August 18, 2011 at 9:45 a.m. to set a date for the filing of a modified final pretrial order if this lawsuit does not settle. The trial date of September 6, 2011 will stand.

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated:** August 9, 2011